RUSSEL WHEEL & FOUNDRY CO. v. HAMMOND, STANDISH & CO.

CORPORATIONS—SUPERINTENDENT—SALARY — INDEBTEDNESS — LIEN ON STOCK.

   A manufacturing corporation agreed to pay its retiring superintendent, who held stock in the company, a yearly salary, in consideration of which his services were to be subject to the call of the company, and any dividends on his stock were to revert to the company to the amount of the salary paid. He afterwards gave his notes to the company for the amount of the salary paid to him, and an order authorizing the treasurer to apply all his stock dividends to the payment of his notes. No dividends were made to apply on the notes. He was not called upon to render services, though he held himself in readiness. *Held*, that he was indebted to the company, and that the company had a lien on his stock for the amount of salary paid, which might be enforced under section 7052, 2 Comp. Laws.

Appeal from Wayne; Frazer, J. Submitted January 9, 1902. (Docket No. 39.) Decided March 18, 1902.

Bill by the Russel Wheel & Foundry Company against Hammond, Standish & Company to enjoin the sale of cer-

tain corporate stock. From a decree dismissing the bill, complainant appeals. Affirmed.

*Walker & Spalding*, for complainant.

*Charles W. Casgrain*, for defendant.

MOORE, J. The complainant, holding as collateral an assignment of stock of C. H. Meday in the defendant corporation, filed this bill to enjoin the defendant from selling that stock to enforce an alleged lien of its own for indebtedness of Mr. Meday. The circuit judge dismissed the bill of complaint, and the case is brought here by appeal.

Defendant is a corporation under the general manufacturing act. Its proceedings to enforce its lien were regular in form. The dispute is upon the existence of the debt for which the defendant's lien is claimed. It turns mainly upon the effect of certain payments of money made by defendant to Mr. Meday, and of the giving of certain notes by him for the amount so received. For many years before December, 1895, Mr. Meday had been the superintendent of the Detroit packing houses of Hammond, Standish & Co., on a salary of $3,500 per year. The Hammond family held a majority of the stock in the company. One of them (George H. Hammond) was president, and his brother Charles F. was a director. In November, 1895, George H. Hammond expressed to Mr. Meday a wish for his resignation, because he himself wanted to be more active in the business, and have entire control and supervision. Soon after a verbal agreement was made between the two Hammonds and Mr. Meday, pursuant to which Mr. Meday tendered his resignation, to take effect December 1st, and sent the secretary of the company a letter stating the terms of the agreement consequent upon his retirement from the superintendency, so far as concerned the company, to be (1) his retention on the board of directors while he remained a stockholder; (2) that he was to receive $3,000 yearly, payable at the office of Hammond,

Standish & Co.; (3) future dividends on his stock up to that amount to be remitted to Hammond, Standish & Co.; (4) the agreement to be annulled by death. At a directors' meeting held 10 days later, the following resolution was introduced by G. H. Hammond, and carried:

"That Mr. C. H. Meday be paid a salary at the rate of $3,000 per annum, payable in monthly installments, for the year ending the 1st day of November, 1896, in consideration of which Mr. Meday's services are to be subject to the call of the company on reasonable notice, and any dividends on stock standing in his name are to revert to the company to the amount of salary paid, namely $3,000. Should the dividends declared exceed the amount of $3,000, the excess to be paid to Mr. Meday."

Mr. Meday held himself in readiness to respond to the company's call for his services, leaving his address with some one in the office whenever he went out of town, so that he might be summoned if necessary. This continued during 1897. He was not called on for service. He drew the money monthly, beginning in December, 1895.

On January 19, 1897, a directors' meeting was held, at which Mr. Meday was present until requested to retire, that his own matter might be considered. After he was gone, the following resolution passed:

"On motion, duly made and seconded, it was voted that the company continue to advance Mr. Meday the sum of $250 per month until November 1, 1897, providing the proper arrangements can be made with him securing same, together with the amount advanced him last year, by an assignment from him of any dividends that may be declared on stock in the company now standing in his name."

At the time of the original resolution of December, 1895, the company was prosperous, and it was expected it would pay dividends. No dividends were declared after 1895 until March, 1899.

Some time after the meeting of January 19, 1897, at which the second resolution was passed, Mr. Standish sent for Mr. Meday, and had a conversation with him, in which

he read to him what purported to be a copy of the resolution passed at the January meeting; stating that the resolution required Meday to give his notes for the moneys drawn, including those already drawn. At the time of this interview Mr. Meday had received from the company $3,500. He then executed five notes, at the request of Mr. Standish, aggregating $3,500, and dated, respectively, February 1, May 1, August 1, and November 1, 1896, and February 1, 1897. He also gave a dividend order, authorizing Mr. Standish, as treasurer, to apply all dividends that might be made on his stock towards the payment of his notes, until same are paid in full. Mr. Standish afterwards sent him, as a copy of the resolution of January 19th, the following:

"Voted, that the company continue to advance to Mr. C. H. Meday the sum of $250 per month until November 1, 1897, taking his notes for said amounts, and for the amounts advanced him during the year which ended November 1, 1896, with his order to the treasurer of the company to apply dividends on 1,232 shares of stock standing in his name until said notes be paid in full."

Mr. Meday afterwards drew $250 a month in March, April, and May, 1897, giving notes therefor, which, with the five already given, are those representing the amount in controversy. Further sums were drawn and notes given therefor at later dates, but these have been retired by payment out of dividends, and are not in question. At the time the notes were given, Mr. Standish testified, Mr. Meday said:

"Why, Mr. Standish, there is no question about this. I am not a pensioner. I do not want any gratuities or anything of that kind. I expect to pay this all back."

Mr. Meday does not deny this. No demand of payment of the notes was ever made on Mr. Meday, and no attempt was made to collect them until the defendant gave notice of sale to enforce its lien in June, 1900.

The record indicates that Mr. Standish gave Mr. Meday to understand when the notes were given that the

resolution of January 19th made his receiving further moneys conditional upon his giving the company his notes for all moneys, including what he had already received under the former resolution, as well as an order for the application of dividends in payment thereof, and that he afterwards sent him, as a copy of the resolution, one making those conditions. Mr. Standish explains the matter by saying that, at the meeting of January 19th, two or three forms of resolutions were drawn, and the board adopted the first one which recommended itself,—the form which did not provide for the notes. The *memoranda* of these resolutions he carried on blocks of pencil paper in an envelope, and by an error the draft of the resolution mentioning the notes got into the minutes of a meeting held on March 12th, and the copy of it sent Mr. Meday was prepared without any intent to deceive him.

The question involved is one of fact. The testimony is not clear, and the solution of the question is a difficult one. If the proposition of Mr. Meday to the company, and the resolution of December, 1895, and the payment of the $3,000 thereunder, were all there was of the transaction, it would not be so difficult; but that was not the end of the transaction. It is apparent that, when that resolution was adopted, it was expected the business of the company would be so profitable there would be dividends upon the stock owned by Mr. Meday, which might exceed the amount which was paid to him; and, in case they did, the excess was to be paid to him, otherwise to the company. It is apparent the $3,000 was not to be paid for services alone. The expectation of Mr. Meday and the company as to dividends was not met. Subsequently advances were made to Mr. Meday under the circumstances before stated. It does not appear that he objected to giving his notes, or that he made any claim at that time that the money he received was simply a payment of salary, or, if it was not, it was to be paid, if paid at all, out of the dividends earned during the year in which it was paid. On the contrary, all the parties seem to have treated the ad-

vances made as a debt which Mr. Meday ultimately expected to pay, and for which he was willing to give his notes. In fact, not only the notes involved here were given, but, when later advances were made to him, he gave other notes, which have been retired by applying upon them subsequent dividends. It is not questioned that, if Mr. Meday owed the defendant, it had a lien upon the stock, which might be enforced under the provisions of section 7052, 2 Comp. Laws.

The decree is affirmed, with costs.

HOOKER, C. J., GRANT and MONTGOMERY, JJ., concurred. LONG, J., did not sit.